## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

MADISON VIGIL FOR LIFE, INC.; a Wisconsin
corporation; GWEN FINNEGAN; JENNIFER
DUNNETT; MARY MARKIELEWSKI; THERESA
KLINKHAMMER; CONSTANCE NIELSEN;
STUDENTS FOR LIFE OF MADISON, an
unincorporated expressive student organization at the
University of Wisconsin-Madison; BADGER
CATHOLIC, a Wisconsin corporation and an       Case No. 14-cv-157-WMC
expressive student organization of the University of
Wisconsin-Madison; FR. RICHARD HEILMAN;
SARAH QUINONES; and RYAN WOODHOUSE;

      Plaintiffs,

v.

CITY OF MADISON, WISCONSIN;

      Defendant.

## FIRST AMENDED COMPLAINT

Come now Plaintiffs Madison Vigil for Life, Inc., Gwen Finnegan, Jennifer Dunnett, Mary Markielewski, Theresa Klinkhammer, Constance Nielsen, Students for Life of Madison, Badger Catholic, Fr. Richard Heilman, Sarah Quinones, and Ryan Woodhouse, and aver the following, which they swear and affirm at the conclusion of this document:

### INTRODUCTION

1.      On March 18, 2014, the City of Madison Common Council by a unanimous voice vote passed ordinance #32827, Version: 2, the City of Madison Buffer Zone Ordinance (hereinafter "Buffer Zone.") Madison Gen. Ord. (hereinafter "MGO") 23.01(1), and the Mayor signed it on March ***, 2014. The Buffer Zone creates 200-foot-wide "bubbles" all around the

City—including on State Street, Capital Square, sidewalks and streets on the UW-Madison campus, outside polling places, at the Dane County Farmers Market, outside hospitals where unions picket, and near the Dane County Courthouse.

2.      Within these bubbles the Buffer Zone prohibits approaching within eight feet of someone on the public way or sidewalk to "[p]ass a leaflet or handbill," "[d]isplay a sign," or "[e]ngage in oral protest, education or counseling" without that person's consent. *Id.*

3.      The Buffer Zone creates these anti-speech bubbles on each entrance of any "place used by a licensed physician or nurse practitioner to routinely provide medical treatment," and of any multi-office building containing such entities where there is no separate entrance for the health care facility. *Id.* Physician and/or nurse practitioner offices exist on almost every populated street in the City. Each entrance of those offices now bears a 100-foot *radius* anti-speech bubble extending from every entrance of the building, with buildings themselves sometimes spanning entire city blocks. The Buffer Zone therefore creates anti-speech bubbles spanning 200 feet in diameter at minimum beyond these buildings—and often extending in much larger diameters where the building has multiple entrances. Those offices may also bear one or more 30-foot radius anti-speech bubble zone extending from the point where the right-of-way intersects with the curbcut of any private driveway of the property upon which the office is located, even where the driveways are much farther than 100 feet away from the building entrances. The Buffer Zone therefore creates additional anti-speech bubbles spanning 60 feet in diameter at minimum beyond those driveways, and will extend further if the offices have more than one private driveway. And because new physician and nurse practitioner offices open in a variety of office buildings and zones, the Buffer Zone ordinance continually spawns new anti-speech bubbles on public sidewalks, streets and other public ways throughout the City.

4.      The Buffer Zone therefore converts miles of City sidewalks and public ways into no-leafleting corridors, including portions of State Street, campus and other areas.

5.      The City has no justification for creating even one anti-speech bubble in traditional public fora, much less creating hundreds of bubbles throughout Madison. The First Amendment contemplates no possible justification for such a measure.  For decades Madison has been the scene of robust free speech and exchanges of ideas, including nationally significant demonstrations to the present day.  The freedom of speech is at its apex on public streets and sidewalks when citizens wish to persuade other citizens by means of leafleting and personal education.  The government cannot arrogate to itself the power to categorically wall off speaker-initiated free speech from large swaths of public ways and sidewalks just because they happen to be near health facilities. No city can convert acres of public ways and sidewalks into anti-leafleting zones.  And no city can target speech based on its content or viewpoint, such as because it consists of "protest" or "education" as opposed to asking for directions or the time of day, or because it is politically motivated against speakers who disagree with the city's views.

6.      Plaintiffs use leafleting, education, counseling and sign displays on public ways throughout Madison in a wide variety of contexts.  They distribute handbills on State Street, engage in personal education on sidewalks near Capital Square, display signs and hand out leaflets on sidewalks and public ways running through campus and near health buildings, offer advocacy and counseling related to abortion, and engage in free speech on public areas outside newsworthy events. The Buffer Zone directly and imminently deprives them and many other citizens of their freedom of speech.

7.      Unless this Court issues a temporary restraining order, followed by preliminary injunctive and permanent relief, the Plaintiffs' leafleting and personal education activities on Madison's sidewalks and streets will be squelched, causing irreparable harm to their freedom of

speech as protected by the First Amendment of the United States Constitution. The City, however, will suffer no injury from injunctive relief issued against its poorly conceived and unjustified attack on free speech. A temporary restraining order and preliminary injunction will preserve the status quo of robust freedom of speech in Madison, which has caused no cognizable public or personal harm and has instead yielded great public benefit.

### JURISDICTION AND VENUE

8. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

9. This Court has original jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. § 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys fees under 42 U.S.C. § 1988.

10. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of Wisconsin, because all claims arise out of this district and/or all parties reside in this district.

### PARTIES

11. Plaintiff Madison Vigil for Life, Inc., ("VFL") is a Wisconsin corporation, and operates as an association of persons engaging in freedom of speech on public sidewalks and other public fora to promote the sanctity of human life for preborn children, their mothers and their families.

12. Plaintiff Gwen Finnegan is the Director of VFL and is a resident of Baraboo.

13. Plaintiff Jennifer Dunnett is a resident of Madison.

14. Plaintiff Mary Markielewski is a resident of Madison.

15.     Plaintiff Theresa Klinkhammer is the Dean of Faculty at St. Ambrose Academy, which is an accredited Catholic middle school and high school in Madison, WI, offering a classical education in grades 6–12. Ms. Klinkhammer is an advisor of St. Ambrose students, and is a resident of Madison.

16.     Plaintiff Constance Nielsen a teacher and administrator at St. Ambrose Academy, is an advisor of its students, and is a resident of Madison.

17.     Plaintiff Students for Life of Madison is an unincorporated expressive student organization at the University of Wisconsin-Madison.

18.     Plaintiff Badger Catholic is a Wisconsin corporation and an expressive student organization at the University of Wisconsin-Madison.

19.     Plaintiff Fr. Richard Heilman is a resident of Pine Bluff.

20.     Plaintiff Sarah Quinones is a resident of Madison.

21.     Plaintiff Ryan Woodhouse is a resident of Wisconsin, just outside of Chaseburg.

22.     Defendant City of Madison ("the City") is a municipal corporation organized and existing under the statutes and constitution of the State of Wisconsin that may sue and be sued.

23.     The City is responsible for enforcing the Buffer Zone against Plaintiffs and for arresting, detaining, fining, and punishing individuals alleged to have violated the ordinance within the corporate limits of the City of Madison.

## STATEMENT OF FACTS

**A.** **The Buffer Zone Creates Hundreds of Bubbles Restricting Free Speech in Madison.**

24.     On February 25, 2014, the City of Madison Common Council passed the Buffer Zone ordinance #32827, Enactment # ORD-14-00046, MGO 23.01, by unanimous voice vote. *See*        https://madison.legistar.com/View.ashx?M=M&ID=265157&GUID=D13E4868-F8B7-45D1-A2D2-524C279F2FED (last visited Mar. 17, 2014).

25.     On March 18, 2014, the Common Council passed a second version of Buffer Zone ordinance #32827, Enactment # ORD-14-00046, MGO 23.01. The Mayor approved the ordinance, and it was published and went into effect on March 27, 2014. *See* Notice of City of Madison, Doc. # 20 (filed Mar. 27, 2014).

26.     The Buffer Zone ordinance creates an untold number of "bubble" areas throughout Madison where person-to-person free speech is restricted.

27.     The Buffer Zone creates a bubble spanning 100 feet in radius from any "entrance to a health care facility," as well as bubbles spanning 30 feet in radius "from the point where the right-of-way intersects with the curbcut of any private driveway for the property upon which the health care facility is located."

28.     The Buffer Zone's 100-foot radius bubbles are, mathematically, 200 feet in diameter at minimum. The Buffer Zone's 30-foot radius driveway bubbles are, mathematically, 60 feet in diameter at minimum (in addition to the width of each driveway).

29.     The Buffer Zone defines "health care facility" as including any "place used by a licensed physician or nurse practitioner to routinely provide medical treatment."

30.     Under the Buffer Zone, "[w]here a health care facility is located in a multi-use or multi-office building and does not have a separate entrance, then the zone[s] . . . appl[y] to all entrances to the building." This creates at least one bubble on each building entrance.

31.     The Buffer Zone's 200-foot bubbles are drawn centering around the outer entrances of buildings that house any place used by a licensed physician or nurse practitioner to routinely provide medical care. The Buffer Zone's 60-foot bubbles are drawn centering from the point where the right-of-way intersects with the curbcut of any private driveway for the property upon which the health care facility is located.

32.     The Bubble Zone ordinance creates scores if not hundreds of speech-restrictive bubbles throughout the City, including in the heart of downtown Madison.

33.     Licensed physicians and nurse practitioners routinely provide medical treatment in offices in buildings with entrances on State Street, Capital Square, University Avenue, the UW-Madison campus, near farmers' markets, near the Dane County Courthouse, and on countless streets throughout Madison.

34.     For example, according to internet listings of offices used for treatment by physicians or nurses, the Buffer Zone creates speech-restricted bubbles around:

- the entire block surrounding the building located in between University Avenue, N. Lake Street, W. Johnson Street, and E. Campus Mall;

- 341 State Street (a multi-office building stretching around the corner of State and Gorham);

- 16 North Carroll Street (near the corner of State and Capital Square);

- 131 West Wilson Street (adjacent to the Dane County Courthouse);

- polling places such as St. Mary's Care Center, 3401 Maple Grove Road, and Meriter McKee Clinic, 3102 Meriter Way, as well as polling places that are adjacent to buildings housing physicians' offices;

- the UW Hospital and Clinics, which has been the site of recent union protests; and

- numerous other addresses such as 2705 Marshall Ct., 2727 Marshall Ct., 2814 Marshall Ct., 2828 Marshall Ct., 124 Mifflin St., 1920 Monroe St., 1930 Monroe St., 1 S. Park St., 20 S. Park St., 202 S Park St., 700 Regent St., 780 Regent St., 1025 Regent St., 3801 Regent St., 2870 University Ave., 2880 University Ave., 660 W Washington Ave., 345 W Washington Ave., 625 W Washington Ave., 675 W Washington Ave., 301 S Bedford St., 36 S Brooks St., 1111 Highland Ave., 1675 Highland Ave., 2500 Overlook Terrace, 1100 Delaplaine Ct., 3503 Gregory St., and 640 Elm Drive.

35.     The Buffer Zone ordinance also creates a panoply of anti-speech bubbles outside of schools where there happens to be an on-site nurse who provides treatment, and outside residential, continuing care, retirement, independent living, and assisted living facilities where

medical treatment is routinely provided. *See, e.g.,* "Capitol Lakes" Retirement Community, 333. W. Main St., which "offers on-site health care for seniors, along with a vibrant lifestyle." *available at* http://www.retirement.org/madison/ (last visited Mar. 27, 2014).

36.     Even a residential apartment building in Madison's downtown area in which a person happens to reside who hires a licensed physician or nurse practitioner to regularly visit to provide in-home medical treatment for needs arising from age or disability would constitute "a place" of medical treatment that generates anti-speech bubbles on the public ways in Madison under the Buffer Zone ordinance.

37.     Within each one of the Buffer Zone ordinance's 200 foot bubbles, the ordinance makes it "unlawful for any person" to "[i]ntentionally approach another person to within eight (8) feet without consent for the purpose of" "doing any of the following on a public way or sidewalk area," namely, to "[p]ass a leaflet or handbill to the person," "[d]isplay a sign to the person," or "[e]ngage in oral protest, education or counseling with the person."

38.     Thus the Buffer Zone prohibits speaker-initiated leafleting and person-to-person education (both of which occur without advance consent and closer than eight feet from the recipient).

39.     It is practically impossible to pass a leaflet or handbill to a person from eight feet away.

40.     It is practically impossible to have a conversation with a person on a public sidewalk from eight feet away.

41.     Leafleting, education and personal sign-display are impossible on a busy sidewalk or public way if the speaker cannot engage in such speech within eight feet of persons prior to obtaining consent, because passersby are always closer than eight feet from the speaker.

42.     Nearly all First Amendment protected leafleting is directed towards recipients that have neither given nor refused consent yet and are less than eight feet away from the leafleter.

43.     The Buffer Zone effectively bans all leafleting and personal education because these types of protected speech are not possible from eight feet away or when advance consent must first be obtained from that distance.

44.     The Buffer Zone's prohibition on "approach[ing]" within eight feet of persons in its bubbles is vague and authorizes discriminatory enforcement.

45.     In a Buffer Zone bubble, when a speaker is standing still and a passerby walks within eight feet of that standing person, and the standing person wishes to distribute leaflets, display signs, or educate the passerby, but the passerby has not invited a leaflet, sign or educational message, the standing speaker cannot know what actions constitute "approaching" that passerby so as to be prohibited by the Buffer Zone ordinance.

46.     Even when a particular "health care facility" is closed, the Buffer Zone's restrictions on speech apply within the bubble it creates around that facility.

47.     Violators of the Buffer Zone's prohibitions "shall be subject to a forfeiture of not less than fifty dollars ($50) nor more than one thousand dollars ($1000)."

48.     The Buffer Zone ordinance authorizes incarceration of violators and imposes a schedule of bail deposits amounting to $300 for the first offense, $500 for the second, and $750 for the third.

**B.   The Buffer Zone was openly motivated against pro-life speakers, while ignoring actual disruptive demonstrations in Madison.**

49.     The City Council enacted the Buffer Zone to stop speaker-initiated leafleting and person-to-person education and sign display outside the Planned Parenthood abortion facility on the east side of Madison, at 3706 Orin Road.

50.     The City Council enacted the Buffer Zone out of disagreement with "anti-choice" persons engaging in free speech outside the Orin Road Planned Parenthood.

51.     The Buffer Zone's primary sponsor Madison City Council Representative Lisa Subeck, a former director of "NARAL Pro-Choice Wisconsin," explained that the Buffer Zone was intended to restrict free speech of speakers because they are "anti-choice," because their speech is "inaccurate," their speech is intended "to sway women from abortion and contraception," and because some of the persons going to Planned Parenthood actually talk to and share information with "anti-choice" persons.[1]

52.     The Buffer Zone's primary sponsor explained that "anti-choice" people approaching within eight feet of a person entering Planned Parenthood is by definition "harassment" and is therefore targeted by the ordinance for that reason. *Id.*

53.     The Buffer Zone's primary sponsor named Plaintiff Madison Vigil for Life, Inc., and its free speech in talking to persons on the public sidewalk and talking to other persons about those conversations afterwards, as the motive for passing the ordinance. *Id.*

54.     In passing the Buffer Zone, the City Council had no evidence that any woman seeking to enter 3706 Orin Road has ever been prevented entry by a person opposing abortion.

55.     The entrance to the Planned Parenthood at 3706 Orin Road is set back approximately 50 feet from the public sidewalk. Between it and the public sidewalk are large areas of grass and parking lot.

56.     These setback areas between Planned Parenthood's entrance and the public sidewalk make the Buffer Zone unnecessary in achieving any legitimate goal.

---

[1] Lisa Subeck, "Buffer zone will balance patient rights and free speech," Wisconsin State Journal (Feb. 20, 2014), *available at* http://host.madison.com/news/opinion/column/guest/lisa-subeck-buffer-zone-will-balance-patient-rights-and-free/article_a0071d60-ea57-5c0d-b808-cf34fddb00e1.html (last visited Feb. 20, 2014).

57.     In passing the Buffer Zone, the City Council had no evidence that any person has attempted, or been arrested for attempting, to block entry to the doors or the driveway of 3706 Orin Road.

58.     In passing the Buffer Zone, the City Council had no evidence that any person has been arrested engaging in free speech activities on public sidewalks and ways surrounding the Planned Parenthood at 3706 Orin Road.

59.     In passing the Buffer Zone, the City Council had no evidence that any crowd has ever hindered access to 3706 Orin Road.

60.     Crowds numbering in the tens of thousands of people, even over 100,000, have engaged in public demonstrations in downtown Madison, far away from 3706 Orin Road, in the past three years alone.[2]

61.     The demonstrations have interfered with access to streets, sidewalks, building entrances and the Capital building itself.[3]

62.     These demonstrations have cost taxpayers millions of dollars in police and other expenses.[4]

63.     Arrests were made in these demonstrations throughout the summer of 2011 and again in the summer of 2013, leading to more than 300 arrests total.[5]

---

[2] See, e.g., http://www.huffingtonpost.com/2011/02/17/wisconsin-protests-scott-walker-police_n_824697.html , http://www.wkow.com/Global/story.asp?S=14062370 , http://www.bloomberg.com/news/2011-02-17/public-employee-union-protests-spread-from-wisconsin-to-ohio.html , http://articles.latimes.com/2011/feb/26/nation/la-na-wisconsin-protests-20110227 , http://wisaflcio.typepad.com/wisconsin-state-afl-cio-blog/2011/03/united-to-support-wisconsin-workers.html , http://www.nytimes.com/2011/04/17/us/politics/17palin.html?_r=0 , http://www.prwatch.org/news/2011/05/10752/wisconsin-protesters-weather-pessimism-may-14-rally , http://www.progressive.org/wx061711.html .
[3] See http://beta.cityofmadison.com/news/mass-demonstrations .
[4] http://www.jsonline.com/news/statepolitics/118818839.html
[5] http://host.madison.com/wsj/news/local/crime_and_courts/article_94a2b5fa-a0bc-5d69-9097-55ff3de76569.html , http://www.jsonline.com/news/statepolitics/124049524.html ,

64. Death threats were made throughout the state in connection to the issues these demonstrations focused on.[6]

65. These demonstrations also led to medical emergencies among the crowds.[7]

66. These demonstrations sometimes led to violence.[8]

67. Beyond these demonstrations and for decades, Madison has been host to thousands of protests on issues unrelated to abortion or health facilities, which have involved significant crowds, arrests and criminal activity, and effects on access to streets and sidewalks.[9]

68. The City of Madison passed the Buffer Zone ordinance knowing about the large crowds gathered downtown in the past three years, and the congestion, arrests, contention and other problems associated with those crowds. *See* Gwen Finnegan Testimony, Ordinance # 32827 Legislative Record. *See* ink, supra ¶ 24.

69. Despite knowing this, the City of Madison did not apply the Buffer Zone in a way that creates bubbles triggered by such crowds, or triggered within specific proximity of the Capital building or of non-health care building entrances near the Capital building.

http://www.jsonline.com/newswatch/128423073.html ,
http://host.madison.com/news/local/crime_and_courts/despite-nearly-arrests-capitol-protest-grows/article_34a452e5-08a9-5388-94bc-40af1875650e.html .
[6] http://talkingpointsmemo.com/dc/26-year-old-woman-charged-with-sending-death-threats-to-gop-senators-in-wisconsin , http://www.jsonline.com/news/statepolitics/121721234.html , http://www.thenorthwestern.com/article/20120330/OSH0104/203300450/Man-charged-disorderly-conduct-changes-from-not-guilty-no-contest?odyssey=tab%7Ctopnews%7Ctext%7CFRONTPAGE
[7] http://beta.cityofmadison.com/news/downtown-demonstration
[8] http://www.huffingtonpost.com/2013/08/26/wisconsin-capitol-arrest-video_n_3818935.html
[9] See, e.g.,
https://www.facebook.com/media/set/?set=a.631980830160764.1073741825.206009666091218&type=3 (gay marriage protest 2013), http://progressive.org/crackdown-in-madison-capitol.html (sidewalk chalk arrest 2012), https://www.youtube.com/watch?v=bp9zpyWoGIA (anti-war march 2012), http://www.isthmus.com/daily/article.php?article=34950 (occupy Madison), http://iso-madison.blogspot.com/ (ongoing socialist protests).

**C. Plaintiffs engage in free speech throughout Madison that is restricted by the Buffer Zone's hundreds of anti-speech bubbles.**

70.     The Buffer Zone's creation of hundreds of anti-speech bubbles impacts a wide variety of free speech activities all over town.

**i. The Buffer Zone targets the speech of Vigil for Life and its participants.**

71.     Plaintiff Madison Vigil for Life, Inc., ("VFL") is an organization that hosts and gathers people to engage in prayer, leafleting, education, sign display, and expressive opposition to abortion primarily on public ways and sidewalks outside the Planned Parenthood abortion center at 3706 Orin Road.

72.     Plaintiff Finnegan is the Director of VFL, a participant in free speech activities at least weekly outside 3706 Orin Road, and is familiar with pro-life free speech that has occurred outside 3706 Orin Road.

73.     Plaintiffs Dunnett and Markielewski are residents of Madison, frequent participants in VFL's free speech activities and similar activities on their own.

74.     Ms. Dunnett participates in free speech activities outside 3706 Orin Road at least weekly, and also frequently engages in such free speech activities outside other locations in Madison, such as the Planned Parenthood at 2222 S. Park Street, and in various other public ways and sidewalk areas.

75.     Ms. Markielewski engages in free speech activities outside 3706 Orin Road on weekdays every week of the year, and on weekdays and weekends multiple times each week during two forty-day time periods in spring and fall. Frequently when she is there on weekdays, very few or no other persons are participating with her..

76.     Plaintiffs Finnegan, Dunnett and Markielewski (collectively, the "VFL sidewalk counselors") go to public ways and sidewalks outside 3706 Orin Road on a weekly and sometimes daily basis to engage in peaceful sidewalk counseling.

77.     While engaged in sidewalk counseling, the VFL sidewalk counselors inform women of alternatives to abortion; warn them about the physical dangers of abortion; assist women or otherwise make referrals for assistance with physical, emotional, and spiritual needs; and counsel family members and friends that often accompany women to abortion facilities.

78.     Due to the personal nature of sidewalk counseling, the VFL sidewalk counselors speak in a normal conversational tone, which requires them to stand closer than eight feet away from individuals in order to be heard.

79.     The VFL sidewalk counselors do not desire or intend to physically touch or harass those individuals they seek to counsel outside 3706 Orin Road, but rather to speak to them in a peaceful manner.

80.     The VFL sidewalk counselors do not yell out to individuals or resort to a sound device in order to be heard because they believe that these methods are counter-productive to counseling on a personal level.

81.     The VFL sidewalk counselors have never trespassed or blocked vehicular or pedestrian ingress or egress to an abortion facility, nor do they intend or desire to do so.

82.     The VFL sidewalk counselors have never been arrested, charged, or convicted of any criminal offense related to their conduct of sidewalk counseling and other expressive activities outside abortion facilities.

83.     The Buffer Zone was created specifically to target the speech of VFL, its participants, and Plaintiffs Finnegan, Dunnett and Markielewski, because of disagreement with the content and viewpoint of their speech.

84.     The Buffer Zone creates an anti-speech bubble extending from the entrances of 3706 Orin Road.

85.     The Buffer Zone prohibits VFL, its participants, and Plaintiffs Finnegan, Dunnett and Markielewski from engaging in speaker-initiated leafleting and person-to-person education within eight feet of persons on public ways and sidewalks outside 3706 Orin Road falling within 100 feet of the entrances and within 30 feet from where the right-of-way interrersects with the curbcut of the private driveway to that building.

86.     The Buffer Zone's bubble at 3706 Orin Road is so large that it restricts speech on public ways and sidewalks even across two streets from 3706 Orin Road.

87.     The Buffer Zone's bubble at 3706 Orin Road therefore restricts speech to persons on public sidewalks across the street from 3706 Orin Road who are not going to 3706 Orin Road.

88.     VFL, its participants, and Plaintiffs Finnegan, Dunnett and Markielewski desire and plan to approach within eight feet of persons within the Buffer Zone's bubble at 3706 Orin Road in the future in order to pass them leaflets or handbills, educate or counsel them, display signs, and/or express opposition to abortion (which the Buffer Zone considers "protest"), both on the same side of the street as 3706 Orin Road and on the other side of the street, but they fear doing so because of the Buffer Zone's penalties.

89.     The Buffer Zone causes VFL, its participants, and Plaintiffs Finnegan, Dunnett and Markielewski to be no longer able to approach for peaceful and quiet sidewalk counseling and leafleting those individuals they identify as about to make the life-altering decision to enter the Planned Parenthood, and thus causes them to lose their audience with those individuals.

90.     VFL, its participants, and Plaintiffs Finnegan, Dunnett and Markielewski cannot convey their sidewalk counseling message through the use of a sign eight feet away from individuals, because signs only convey a small part of their message and the distance prevents

them from offering the personal care, empathy, and help that women contemplating abortion need.

91. VFL, its participants, and Plaintiffs Finnegan, Dunnett and Markielewski cannot convey their sidewalk counseling message by waving leaflets from eight feet away from individuals, because individuals can neither read nor receive leaflets from that distance and are less likely to stop and take the leaflets as a result.

92. VFL and Plaintiffs Finnegan, Dunnett and Markielewski cannot afford to use radio, TV, bus ads, or mass mailings to reach women with their pro-life message.

93. None of the expressive methods left unprohibited by the Buffer Zone ordinance allow Plaintiffs to communicate their message to women contemplating abortion.

94. The Buffer Zone ordinance chills and restricts the speech of VFL, its participants, and Plaintiffs Finnegan, Dunnett and Markielewski.

95. The City has no evidence that the free speech activities of VFL, its participants, or Plaintiffs Finnegan, Dunnett and Markielewski justify the application of the Buffer Zone ordinance.

96. The City has no evidence that the free speech activities of Ms. Dunnett or others outside the Planned Parenthood on S. Park Street justify the application of the Buffer Zone ordinance.

ii. **The Buffer Zone restricts students and teachers desiring to hand out "pro-life cupcakes" with leaflets on State Street.**

97. Plaintiffs Klinkhammer and Nielsen (the "St. Ambrose Faculty") are educators and advisors to students attending St. Ambrose Academy, a private middle school and high school in Madison.

98.     The St. Ambrose Faculty supervise and participate with the St. Ambrose student group "Guardians for Life," which engages in various pro-life activities around Madison including free speech, leafleting and person-to-person education.

99.     St. Ambrose Faculty and Guardians for Life participate in "Cupcakes for Life" day, wherein the St. Ambrose Faculty and Guardians for Life students go to State Street in Madison and distribute to passersby free cupcakes that have a pro-life message attached on a piece of paper and sometimes emblazoned in icing on the cake.

100.     St. Ambrose Faculty and Guardians for Life are closer than eight feet from the passersby that take the cupcakes, and from many passersby to whom they offer the cupcakes.

101.     Some of the cupcake-and-leaflet recipients remain to speak with St. Ambrose Faculty and Guardians for Life about pro-life issues. St. Ambrose Faculty and Guardians for Life intend and welcome these educational conversations.

102.     These cupcakes and/or their attached papers are leaflets or handbills under the Buffer Zone ordinance, and their distribution and consequent generation of discussions constitute education within the meaning of the Buffer Zone ordinance.

103.     By its creation of present and future bubbles on State Street, the Buffer Zone ordinance threatens to prohibit the pro-life cupcake distribution of St. Ambrose Faculty and Guardians for Life.

104.     St. Ambrose Faculty and Guardians for Life cannot convey their message through the use of signs or by waving cupcakes at people from eight or more feet away, because the distance prevents them from offering and persons from receiving their message and entering into conversation.

105.     St. Ambrose Faculty and Guardians for Life desire and plan to approach in the future on their own initiative and closer than eight feet from persons on State Street to distribute

leaflets or handbills, educate or counsel, or display signs or other messages to such persons, but they fear doing so because of the Buffer Zone's present and future bubbles on State Street and its penalties.

106.     The Buffer Zone ordinance therefore chills the speech of St. Ambrose Faculty and Guardians for Life.

107.     The City of Madison has no evidence justifying any application of the Buffer Zone to the free speech St. Ambrose Faculty and Guardians for Life on State Street, or evidence that justifies applying the Buffer Zone to anyone anywhere on State Street.

108.     St. Ambrose Faculty and Guardians for Life students in grades nine through twelve are also participants of Vigil for Life outside 3706 Orin Road in the free speech activities of VFL as described above, and the Buffer Zone similarly restricts and chills that speech.

### iii. **The Buffer Zone restricts free speech on and around the UW-Madison campus.**

109.     Plaintiff Students for Life of Madison ("SFLM") is an unincorporated expressive student organization at the University of Wisconsin-Madison.

110.     Plaintiff Badger Catholic is a Wisconsin corporation and an expressive student organization at the University of Wisconsin-Madison.

111.     SFLM and Badger Catholic both engage in freedom of speech, speaker-initiated leafleting, sign display and person-to-person education on public ways and sidewalks around campus and in nearby locations.

112.     Countless issues of public importance occur at and are discussed in and around buildings throughout the UW-Campus that house clinics or offices used by licensed physicians or nurse practitioners.

113.     The Buffer Zone creates anti-speech bubbles in areas around campus where SFLM and Badger Catholic want to be able to engage in speech.

114.     The UW-Madison Student Government is housed in the same massive multi-office building as University Health Services, taking up the block between W. Johnson Street, N. Lake Street, University Avenue and E. Campus Mall. (The building is often referred to as "University Square" or the "Lucky Building.")

115.     Untold amounts of expressive activity, speaker-initiated leafleting, sign display and person-to-person education occur on the public ways and sidewalks within 100 feet of entrances to the University Square building.

116.     Badger Catholic has an office in that building, but the Buffer Zone ordinance prohibits it from engaging in speaker-initiated leafleting in the massive bubbles created around its own building.

117.     University Health Services is on the fifth through eighth floors of part of the University Square building, and has no "separate" external entrance.

118.     Therefore, as shown in demonstrative Exhibit 1, the Buffer Zone ordinance creates a continuous array of bubbles on and around the University Square building, one on each entrance, imposing its speech restrictions not only on almost all sidewalks and ways on that block, but *across the street* on opposing public sidewalks as well. See Exhibit 1.

119.     Even the entrances to Buffalo Wild Wings, Erik's Bike Shop and Verizon Mobile Generation on University Avenue each generate their own 200-foot anti-speech bubbles because they happen to be in the Lucky Building, despite being almost a block away from University Health Services.

120.     The Buffer Zone creates bubbles that encompass other public sidewalks and ways around buildings on and near campus and on State Street.

121. SFLM and Badger Catholic desire and plan to approach in the future on their own initiative and closer than eight feet from persons within the Buffer Zone's bubbles to distribute leaflets or handbills, educate or counsel, or display signs or other messages to such persons, but they fear doing so because of the Buffer Zone's penalties.

122. SFLM and Badger Catholic cannot convey their message through the use of signs, leaflets or education eight or more feet away from passersby, because the distance prevents them from offering and persons from receiving their message and entering into conversation, and because SFLM and Badger Catholic members wishing to engage in such speech cannot retreat more than eight feet from passersby since crowds of student and other passersby mean that there is nearly always someone less than eight feet away from them.

123. The Buffer Zone therefore restricts and chills the speech of SFLM and Badger Catholic.

124. The City has no evidence that the free speech activities of SFLM and Badger Catholic, or any campus related free speech activities, justify the application of the Buffer Zone ordinance on and around campus or on State Street.

### iv. The Buffer Zone restricts free speech and rallies held on public ways and sidewalks around Capital Square.

125. Plaintiff Fr. Richard Heilman regularly leads rallies on early weekday evenings at State Street and Capital Square West, which are called "Rosary Rallies."

126. At Fr. Heilman's Rosary Rallies, sometimes hundreds of people pray the rosary and engage in other free speech on the public ways and sidewalks at State Street, W. Mifflin Street and N. Carroll Street.

127.     At these rallies participants have educated passersby, and have displayed signs, balloons and t-shirts with messages or expressive images on them. Fr. Heilman wishes to distribute leaflets and handbills that would, for example, teach people how to pray the rosary.

128.     Many people pass by on the public way at the Rosary Rallies, including through and next to the crowd.

129.     Rosary Rallies are confronted by about a dozen counter-protestors, who also walk next to the rally crowd. Rosary Rally participants have engaged in discussion with these persons.

130.     The Buffer Zone creates anti-speech bubbles on Capital Square.

131.     For example, the internet lists a psychotherapy centre in a multi-office building at 16 N. Carroll Street, and that center has a licensed physician on staff.

132.     The Buffer Zone creates anti-speech bubbles extending off the multi-office building at 16 N. Carroll Street that reaches public sidewalks and ways across N. Carroll Street.

133.     The Buffer Zone creates bubble(s) that encroach the public sidewalks and ways where the Rosary Rally and its participants engage in or wish to engage in speech.

134.     Fr. Heilman and Rosary Rally participants desire and plan to approach in the future on their own initiative and closer than eight feet from persons within the Buffer Zone's bubble(s) on Capital Square to pass them leaflets or handbills, educate or counsel them, or display signs or other messages, but they fear doing so because of the Buffer Zone's penalties.

135.     Fr. Heilman and Rosary Rally participants cannot convey the message contained in leaflets when prohibited from approaching within eight feet of passersby, because the distance prevents them from offering and persons from receiving their message and entering into conversation.

136.     The Buffer Zone therefore restricts and chills Fr. Heilman's and Rosary Rally participants' speech.

137. The City has no evidence that the free speech activities of Fr. Heilman's and Rosary Rally participants justify the application of the Buffer Zone ordinance to them, or evidence that justifies applying the Buffer Zone to anyone anywhere on Capital Square.

### v. The Buffer Zone restricts free speech outside polling places.

138. State law allows electioneering, including leafleting and education, outside 100 feet from the entrance of a polling place on election day.

139. Several polling places are health facilities under the Buffer Zone ordinance, and possess driveways more than 100 feet away from their building entrances.

140. The Buffer Zone creates bubbles around the driveways of polling places where electioneering is otherwise permitted and has frequently occurred on election day.

141. Some polling places that are not themselves health facilities are next to or nearby health facilities, and their legal electioneering zones are restricted by Buffer Zone bubbles.

142. Plaintiff Sarah Quinones engages in leafleting related to campaigns and electioneering outside polling places.

143. Ms. Quinones and Ms. Dunnett both desire and plan to approach in the future on their own initiative and closer than eight feet from persons within the Buffer Zone's bubble(s) near and around polling places to pass them leaflets or handbills, educate or counsel them, or display signs or other messages, but they fear doing so because of the Buffer Zone's penalties.

144. Plaintiffs Dunnett and Quinones cannot convey their leafleting, sign and educational messages when prohibited from approaching within eight feet of passersby, because that distance prevents them from offering and persons from receiving their message and entering into conversation.

145. The Buffer Zone therefore restricts and chills Ms. Dunnett's and Ms. Quinones's speech.

146.    The City has no evidence that the free speech activities of Ms. Dunnett, Ms. Quinones or anyone else on public ways and sidewalks outside of the 100-foot electioneering limit around polling places justifies the application of the Buffer Zone ordinance to them.

**vi.    The Buffer Zone restricts free speech on public ways and sidewalks around the Dane County Farmers Market.**

147.    The Dane County Farmers Market hosts both sales of produce and expressive activities in downtown Madison.  http://dcfm.org/ .

148.    The Saturday market occurs on the public sidewalks around Capital Square.

149.    The market occurs adjacent to public sidewalks on which anyone is allowed— apart from the Buffer Zone ordinance—to walk, pass by, and engage in person-to-person leafleting, sign display or personal education to other persons in the crowd.

150.    In addition to selling food products, the farmers markets include tables engaging in expressive activity.

151.    As described above, on N. Carroll Street at least, the Buffer Zone ordinance creates bubbles that restrict speech, and these same bubbles encroach onto public ways and sidewalks where persons walk past the Saturday farmers' market.

152.    The Buffer Zone in its bubbles overlapping the farmers market restricts both the expressive activity of speakers with tables, and the expressive activity of persons in the crowd who are either speaking an independent message or are speaking in response to expressive activity spoken by those with tables.

153.    Ms. Dunnett desires and plans to approach in the future on her own initiative closer than eight feet from persons within the Buffer Zone's bubble(s) near and around the farmers market to pass them leaflets or handbills, educate, or display signs or other messages, but she fears doing so because of the Buffer Zone's penalties.

154.     Ms. Dunnett cannot convey her leafleting and educational messages when prohibited from approaching within eight feet of passersby, because that distance prevents her from offering and persons from receiving her message and entering into conversation, and the crowds at farmers markets are so thick that there are nearly always persons within eight feet of her.

155.     The Buffer Zone therefore restricts and chills Ms. Dunnett's speech.

156.     The City has no evidence that the free speech activities of Ms. Dunnett or anyone else on public sidewalks around the downtown farmers market justify the application of the Buffer Zone ordinance to them.

### vii.   The Buffer Zone restricts free speech on State Street, around campus, and all over Madison for people who leaflet, educate and display signs.

157.     Plaintiff Ryan Woodhouse lives in Wisconsin just outside of Chaseburg, but frequently comes to Madison to engage in free speech.

158.     Mr. Woodhouse has never been outside the Planned Parenthood in Madison. Instead Mr. Woodhouse goes to populated areas in Madison such as State Street, public ways around campus, and during special events (such as UW football games) to engage in free speech.

159.     Mr. Woodhouse uses speaker-initiated leafleting, sign display, t-shirt messages and person-to-person education to share the message that Jesus Christ died to save sinners, and that everyone should repent and believe in the name of Jesus.

160.     Mr. Woodhouse often tours campuses around Wisconsin to engage in free speech, including the UW-Madison campus.

161.      The Buffer Zone creates anti-speech bubbles on State Street, in innumerable public ways on and around campus, and on the sidewalks streets within a half mile of Camp Randall.

162.     Mr. Woodhouse desires and plans to approach in the future on his own initiative and closer than eight feet from persons within the Buffer Zone's bubble(s) on public ways on State Street, around campus, near Camp Randall and near other public events, to pass leaflets or handbills to those persons, educate or counsel them, or display signs or other messages, but he fears doing so because of the Buffer Zone's penalties.

163.     Mr. Woodhouse cannot convey his leafleting, sign and educational messages when prohibited from approaching within eight feet of passersby, because that distance prevents him from offering and persons from receiving the message and entering into conversation, and it is impossible to stay eight feet away from everyone when he is speaking or offering his message to everyone on a busy sidewalk or in a crowd.

164.     The Buffer Zone therefore restricts and chills Mr. Woodhouse's speech.

165.     The City has no evidence that the free speech activities of Mr. Woodhouse or anyone else on State Street, on public ways around campus, or on public ways in the vicinity of Camp Randall or other events, justify the application of the Buffer Zone ordinance to them.

**viii.    The Buffer Zone restricts free speech of various kinds around Madison.**

166.     Plaintiff Sarah Quinones engages in various forms of free speech on public ways in Madison.

167.     Ms. Quinones produces and distributes leaflets in favor of the legal sale of raw milk and on other topics.

168.     Ms. Quinines engages in campaign-related leafleting, as well as electioneering 100 feet from polling places on election day.

169.     Ms. Quinones leaflets outside significant events that occur in Madison such as a visit by President Obama.

170.    The Buffer Zone creates anti-speech bubbles all over Madison by attaching them to hundreds of buildings where a physician or nurse practitioner who routinely uses an office to provide medical treatment.

171.    The Buffer Zone creates anti-speech bubbles outside numerous polling places in the City, either because the polling place itself houses a place where medical treatment is provided and has a driveway located more than 100 feet beyond a building entrance, or because the polling place is near a building with health facilities in it.

172.    The Buffer Zone therefore creates bubbles that restrict electioneering leafleting, education and sign display in areas that are 100 feet and beyond the entrances to polling places, and where such electioneering has normally occurred, but can no longer occur in ways prohibited by the Buffer Zone ordinance.

173.    Ms. Quinones would like to be able to approach on her own initiative and closer than eight feet from persons within the Buffer Zone's bubble(s) that envelop public ways 100 feet away or farther from polling place entrances to pass such persons leaflets or handbills, educate or counsel them, or display signs, but she fears doing so because of the Buffer Zone's penalties.

174.    Ms. Quinones cannot convey her leafleting, sign and educational messages when prohibited from approaching within eight feet of passersby, because that distance prevents her from offering and persons from receiving the message and entering into conversation, including but not limited to situations in which she wishes to be able to engage in electioneering.

175.    The Buffer Zone therefore restricts and chills Ms. Quinones' speech.

176.    The City has no evidence that the free speech activities of Ms. Quinones in distributing raw milk leaflets, campaign leaflets, leaflets outside well-attended public events, or

electioneering, justifies the application of the Buffer Zone ordinance to her or to any speakers in similar circumstances.

**LEGAL ALLEGATIONS AND RELIEF SOUGHT**

177.	The Buffer Zone inflicts irreparable injury to Plaintiffs' rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

178.	Plaintiffs seek a declaratory judgment that the Buffer Zone ordinance violates their rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

179.	Plaintiffs seek a temporary restraining order, and preliminary and permanent injunctive relief to prevent the City from enforcing the Buffer Zone ordinance in a manner inconsistent with their constitutional rights.

180.	Plaintiffs seek nominal damages and attorneys' fees and costs.

181.	Unless and until this Court issues declaratory relief, the City will enforce the Buffer Zone ordinance through its officers, servants, agents, and employees.

182.	Unless and until this Court issues an injunctive order, the City will enforce the Buffer Zone ordinance through its officers, servants, agents, and employees.

183.	All of the acts of the City, its officers, servants, agents, and employees, as alleged herein, were done and are continuing to be done under color and pretense of the statutes, ordinances, regulations, customs, and usages of the City of Madison and the State of Wisconsin.

**FIRST CAUSE OF ACTION**
**Violation of the rights to Freedom of Speech and of the Press**
**under the First Amendment to the U.S. Constitution**

184.	Plaintiffs reallege paragraphs 1–183 and incorporate them herein.

185.     The public ways and sidewalks that fall under the Buffer Zone ordinance's provisions are traditional public fora.

186.     The Buffer Zone ordinance is overbroad on its face and as applied because it prohibits speech and expressive activities of Plaintiffs and third parties not before the court in the restricted areas.

187.     The Buffer Zone ordinance is overbroad on its face and as applied because it prohibits speech and expressive activities on any topic in front of businesses and other establishments that are unrelated to health care facilities yet within the restricted areas.

188.     The Buffer Zone ordinance is overbroad on its face and as applied because it prohibits speech in areas outside of all "health care facilities."

189.     The Buffer Zone ordinance is overbroad on its face and as applied because it creates hundreds of speech-restrictive bubbles all over the City of Madison in areas and situations in which the City does not even have an alleged interest in restricting speech, and it is continually generating new bubbles whenever a physician or nurse practitioner's place of treatment opens, relocates, or comes into existence.

190.     The Buffer Zone ordinance is overbroad on its face and as applied because it prohibits individuals from approaching others without their consent whether or not an individual intends to enter a health care facility.

191.     The Buffer Zone ordinance is overbroad on its face and as applied because its speech restrictions apply in a "health care facility's" bubbles even when the facility is closed.

192.     The Buffer Zone ordinance is overbroad on its face and as applied because its speech restrictions apply to large amounts of free speech and in numerous locations beyond what the City identified as necessitating the ordinance.

193.    The Buffer Zone ordinance is overbroad on its face and as applied because within its bubbles it prohibits most First Amendment protected leafleting, which is directed towards recipients that have neither given nor refused consent yet and are less than eight feet away from the leafleter.

194.    Because the Buffer Zone ordinance is an unconstitutionally overbroad restriction on expressive activity, the ordinance restricts more speech than necessary to achieve any governmental interest.

195.    The Buffer Zone ordinance is an unconstitutional content- and viewpoint-based restriction in that it was enacted and is applied so as to restrict pro-life speech, but permit speech in favor of abortion or concerning topics and speakers not disfavored by the City.

196.    The Buffer Zone ordinance creates an impermissible risk of discriminatory enforcement against Plaintiffs because the City intends to restrict Plaintiff's pro-life speech within the 100 foot zone around abortion clinics entrances and within the 30 foot zone outside of abortion clinic driveways, and prohibit them from approaching people entering the health care facilities within or closer than eight feet from those persons, while at the same time permitting abortion clinic employees and volunteers to engage in pro-abortion speech, and permitting speech by persons with whom the City does not disagree religiously or politically.

197.    The Buffer Zone ordinance creates an impermissible risk of discriminatory enforcement against Plaintiffs because the City outlawed such a vast array of routine leafleting activities that it will apply its ordinance in a discriminatory and inconsistent fashion.

198.    The Buffer Zone discriminates on its face and as applied against Plaintiffs by prohibiting them from engaging in speech and other expressive activities in traditional public fora based solely upon the pro-life content and viewpoint of their speech.

199. The Buffer Zone ordinance is an unconstitutional content- and viewpoint-based restriction in that it requires a government official, pursuant to unbridled discretion, to determine what speech and speakers around the City are restricted by the ordinance, what constitutes an unlawful "approach," and what is "a place used by a licensed physician or nurse practitioner to routinely provide medical treatment."

200. The Buffer Zone ordinance imposes an impermissible prior restraint on constitutionally protected speech because it restricts speech in advance of expression in the public way and sidewalk area outside health care facilities and other businesses and establishments, but provides no criteria to guide decision-makers in determining what speech is permissible.

201. The Buffer Zone ordinance imposes an impermissible prior restraint on the distribution of printed expression that is unconstitutional on its face and as applied because it contains no guidelines or criteria to guide decision-makers on what literature may permissibly be distributed.

202. The Buffer Zone ordinance's ban on free speech activities in the public way and sidewalk area outside health care facilities imposes an unconstitutional restriction on constitutionally protected speech in traditional public fora.

203. No compelling, substantial, or even legitimate governmental interest exists to justify the Buffer Zone ordinance's restrictions on speech in traditional public fora.

204. The Buffer Zone ordinance is not the least restrictive means to accomplish any permissible purpose sought to be served by the City, and the Ordinance restricts substantially more speech than necessary.

205. The Buffer Zone ordinance is not narrowly tailored to the City's asserted interest in that the ordinance restricts speech unrelated to its asserted interest and creates a distance

requirement that forces speakers to yell out to individuals or resort to an amplification device to be heard, increasing rather than decreasing the alleged perception of "harassment."

206. The Buffer Zone ordinance does not leave open ample alternative channels of communication for Plaintiffs to engage in expressive activities.

207. Expressive speech methods that are not prohibited by the Buffer Zone ordinance do not allow Plaintiffs to communicate their messages to their audiences.

208. Plaintiffs' effective communication of their messages requires personal approaches to persons, and the Ordinance completely forecloses this method of communication.

209. The Buffer Zone ordinance on its face and as applied violates Plaintiffs' rights to freedom of speech and of the press under the First Amendment to the United States Constitution.

210. Wherefore, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the prayer for relief.

**SECOND CAUSE OF ACTION**
**Violation of substantive and procedural Due Process**
**of the Fourteenth Amendment to the U.S. Constitution**
**(and of the First Amendment as it relates to speech)**

211. Plaintiffs reallege paragraphs 1–183 and incorporate them herein.

212. The Buffer Zone ordinance impermissibly risks the violation of Plaintiffs' substantive and procedural due process rights by applying the ordinance contrary to its written terms by solely restricting speakers that are pro-life or with whom the City disagrees.

213. The Buffer Zone ordinance is an unconstitutionally vague restriction on speech on its face and as applied because it fails to adequately advise, notify, or inform persons subject to prosecution under the ordinance of its requirements, including the requirement as to what subject matter of speech it prohibits, what activities constitute an "approach" to persons, what places are

used by licensed physicians or nurse practitioners to routinely provide treatment, and what qualifies as a "licensed" nurse practitioner.

214.    The Buffer Zone ordinance is an unconstitutionally vague restriction on speech on its face and as applied because it fails to provide fair notice and warning to individuals as to when and under what circumstances the consent requirement applies and is satisfied.

215.    The Ordinance is unconstitutionally vague because it lacks any standards or criteria to guide those charged with enforcing it and thus gives them unbridled discretion to determine what speech activities are, and are not, permissible within the bubbles it creates.

216.    The Ordinance is an irrational and unreasonable policy, which imposes irrational and unreasonable restrictions on the exercise of Plaintiffs' constitutional rights.

217.    The City enacted the Buffer Zone ordinance to impermissibly and arbitrarily target pro-life Plaintiffs because of their speech against abortion.

218.    The City does not have a compelling, or even rational, reason to prevent Plaintiffs from engaging in any of their panoply of speech and expressive activities, including but not limited to peacefully approaching women for personal, caring conversations outside abortion facilities.

219.    The Ordinance violates Plaintiffs' substantive and procedural due process rights on its face and as applied in violation of the Fourteenth Amendment to the United States Constitution.

220.    Wherefore, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the prayer for relief.

### THIRD CAUSE OF ACTION
**Violation of the Equal Protection Clause**
**of the Fourteenth Amendment to the U.S. Constitution**

221.    Plaintiffs reallege paragraphs 1–183 and incorporate them herein.

222. The Equal Protection Clause of the Fourteenth Amendment requires that the government treat similarly situated persons equally.

223. The Buffer Zone ordinance impermissibly creates the risk that the City will apply the ordinance to Plaintiffs even though similarly situated individuals with whom the City does not disagree are allowed to engage in speech, including pro-abortion speech, in the same locations and types of locations.

224. In enacting the Buffer Zone ordinance, the City has treated and has authorized itself to treat Plaintiffs differently than similarly situated persons based on the content and viewpoint of Plaintiffs' speech, thereby suppressing the exercise of their constitutional rights.

225. The Buffer Zone ordinance and the City's authority to enforce it against Plaintiffs violate various fundamental rights of Plaintiffs, such as rights of free speech, freedom of the press, free assembly, and free exercise of religion.

226. When government regulations like the Buffer Zone ordinance infringe on fundamental rights, discriminatory intent is presumed.

227. The City can offer no compelling, or even rational, interest to justify prohibiting Plaintiffs' speech and expressive activities, while permitting similarly situated individuals to engage in speech on other topics in the public way and sidewalk areas restricted by the Buffer Zone ordinance.

228. The Buffer Zone ordinance is not the least restrictive means and is not narrowly tailored to accomplish any permissible purpose sought to be served by the City.

229. The Buffer Zone ordinance constitutes a violation of Plaintiffs' rights to equal protection on its face and as applied in violation of the Fourteenth Amendment to the United States Constitution.

230.     Wherefore, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief in that this Court:

A.     Assume jurisdiction over this action;

B.     Declare the Buffer Zone ordinance, ordinance #32827, Version: 2, the City of Madison Buffer Zone Ordinance, Enactment # ORD-14-00046, Madison Gen. Ord. § 23.01(1) and amendment to § 1.08(3)(a), unconstitutional on its face because it violates the rights of Plaintiffs and others not before the court to the freedoms of speech and of the press, and the rights to due process and equal protection, which are guaranteed to Plaintiffs and others under the United States Constitution;

C.     Declare the Buffer Zone ordinance unconstitutional as applied to the speech and expressive activities of Plaintiffs, described in this First Amended Complaint, because they violate Plaintiffs' right to freedom of speech and of the press, and the rights to due process and equal protection, which are guaranteed to Plaintiffs and others under the United States Constitution;

D.     Grant a temporary restraining order, and preliminary and permanent injunctive relief against the Buffer Zone ordinance on its face with respect to Plaintiffs and others not before the court and as applied to Plaintiffs.

E.     Grant to Plaintiffs an award of nominal damages;

F.     Grant to Plaintiffs an award for their costs of litigation, including reasonable attorneys' fees and costs; and

G.     Grant such other and further relief as this Court deems just and proper.

Plaintiffs demand a jury for all issues so triable.

Respectfully submitted this 28th day of March, 2014

_s/Matthew S. Bowman_

MATTHEW S. BOWMAN
DC Bar No. 993261
STEVEN H. ADEN*
DC Bar No. 46777
ALLIANCE DEFENDING FREEDOM
801 G Street, NW, Suite 509
Washington, D.C. 20001
(202) 393-8690
(202) 347-3622—facsimile
mbowman@alliancedefendingfreedom.org
saden@alliancedefendingfreedom.org

KEVIN H. THERIOT
KS Bar No. 21565
ALLIANCE DEFENDING FREEDOM
15192 Rosewood
Leawood KS 66224
(913) 685-8000
(913) 685-8001—facsimile
ktheriot@alliancedefendingfreedom.org

DAVID A. CORTMAN
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E., Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-7644—facsimile
dcortman@alliancedefendingfreedom.org

JONATHAN SCRUGGS*
AZ Bar No. 030505
ALLIANCE DEFENDING FREEDOM
15100 N 90th Street
Scottsdale, AZ 85260-2901
(480) 444-0020
(480) 444-0028—facsimile
jscruggs@alliancedefendingfreedom.org

ATTORNEYS FOR PLAINTIFFS

*Pro hac vice motions forthcoming.

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2014, I promptly caused a copy of the foregoing First Amended Complaint to be delivered to counsel for Defendants by means of the Court's ECF filing and notice system.

Respectfully submitted,

*s/Matthew S. Bowman*
MATTHEW S. BOWMAN
ALLIANCE DEFENDING FREEDOM
*Attorney for Plaintiffs*

# EXHIBIT 1

Buffer Zone Ordinance bubbles around University Square building

